UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**LEXINGTON**

VICKI L. CAMERON,                    )
                                     )
                                     ) Civil Action No. 5:04-CV-24-JMH
        Plaintiff,                   )
                                     )
v.                                   )
                                     )
DAIMLERCHRYSLER, CORP.,              )    **MEMORANDUM OPINION AND ORDER**
                                     )
                                     )
        Defendant.                   )
                                     )
                                     )

                 **       **      **     **     **


    This matter is before the Court on cross motions for summary judgment [Record Nos. 66 & 68].  The parties have responded and replied and the matter is now ripe for review.


                    **Factual Background**[1]

    The plaintiff, Vicki L. Cameron ("Cameron"), filed the instant action against the defendant, DaimlerChrysler Corp. ("DCC"), alleging that the parking brake assembly in the plaintiff's 1991 Jeep Wrangler is defective.  Specifically, the plaintiff alleges 1) a design defect claim; 2) express and implied warranty claims; and 3) a post-sale failure to warn claim.  The plaintiff amended her complaint to allege that the defendant's conduct amounted to gross

_____
    [1] Additional facts will be stated throughout the opinion as necessary to the Court's analysis.

negligence and, as such, warrants punitive damages.

On April 7, 2003, the plaintiff arrived at her home in Sadieville and parked her Jeep near the mailbox. The plaintiff was the fourth owner of the Jeep that she purchased from a used car dealership, Grayson's Auto Mart, in December of 2002.

On the day of the accident, the plaintiff placed the manual transmission car in neutral, left the car running, and engaged the parking brake. The parties contest whether the parking brake was fully depressed. As the plaintiff reached the right rear of her Jeep, the plaintiff alleges that she heard a "pop" coming from her vehicle and noticed that the Jeep was rolling toward a creek that was an eight-foot drop from the road. The plaintiff ran toward the vehicle and entered on the passenger side door. She states that she grabbed the steering wheel with both hands and attempted to steer the Jeep toward a bridge that crossed the creek, but the Jeep went off the road and into the creek eight feet below. The plaintiff was pinned underneath the Jeep for approximately an hour. As a result of the accident, the plaintiff alleges that she suffered brain injury, cognitive disorder, permanent disability, and an inability to return to work or care for herself.

Approximately a week after the accident, the plaintiff received a recall notice for the parking brake assemblies in all 1990 through 1995 Jeep Wranglers from the defendant manufacturer of the plaintiff's Jeep. The recall notice states that the defendant

"determined that a defect, which relates to motor vehicle safety, exists in some 1990 through 1995 model year Jeep Wrangler vehicles." (Pl.'s Mot. For Summ. J., Ex. 12.)  The recall notice states that the "park brake pedal assembly on your vehicle . . . may self-release without warning, allowing unintended vehicle movement.  Unintended movement of the vehicle could injure those in and/or near the vehicle or cause an accident without warning."  The recall notice provides that the defendant manufacturer will replace the parking brake assembly free of charge or will reimburse any customers that have repaired the brake assembly prior to the notice. (*Id.*)

The defendant decided to issue the voluntary recall on January 31, 2002.  The defendant notified the National Highway Traffic Safety Administration ("NHTSA") of its decision on February 7, 2002, and began issuing recall notices on September 30, 2002, prior to the plaintiff's purchase of her vehicle.

Two years prior to the recall, in September of 2000, the NHTSA began a preliminary investigation in response to eleven complaints received by its Office of Defect Investigations ("ODI") on 1994-1995 Jeep Wranglers concerning the parking brake self-release. Seven of the eleven complaints alleged that the self-release resulted in the vehicle rolling and crashing.

In response to the NHTSA investigation, the defendant identified sixty-five customer complaints and two thousand three

3

hundred and ninety-five warranty claims relating to parking brake assemblies in 1994-1995 Jeeps.  The defendant received the first customer complaint in 1993.  In January of 2001, the NHTSA conducted an Engineering Analysis for Jeep Wranglers that also included 1987-1993 Jeeps because the earlier models had the same parking brake assemblies.

During the NHTDA's Engineering Analysis, ODI received twenty additional complaints on 1994-1995 Jeep Wranglers.  In response, ODI and the Vehicle Research and Transportation Center ("VRTC") conducted field inspections and testing.  In January of 2002, ODI met with VRTC and the defendant's engineers to discuss the issue and at the meeting, ODI and VRTC engineers "demonstrated the potential for the parking brake to self-release."  (*Id.*, Ex 7.) Testing completed by VRTC concluded that "the subject parking brake assembly can assume a perched condition on some engagements."  When in a perched condition, "the parking brake assembly has the potential to self-release after some period of time that could vary from several seconds to many hours."  Further, VRTC testing determined that "[t]he subject Jeep parking brakes have the potential to perch due to the geometry of the pawl and sector tooth profile.  Compared with other parking brakes, the tooth profile, in general, is more rounded and not as steep, which increases the chance that it will perch."  Finally, the testing concluded that "the geometry results in forces that tend to unlock the mechanism

4

rather than lock it."  (*Id.*)

The defendant states that during the time NHTSA initiated the investigation in 2000 and the issuance of the recall in 2002, it 1) gathered data in response to NHTSA requests; 2) gathered a representative sample of parking brakes; 3) tested existing parking brakes to determine whether complaints were correctly identified; 4) designed a new parking brake replacement; 5) tested the new parking brake; 6) began production and shipped the new brakes to dealerships across the country; and 7) located registered owners of 1990-1995 Jeep Wranglers by mail notice of the recall.  (Def.'s Resp. at 5-6.)

In February of 2002, the defendant informed NHTSA by letter that a safety recall would be issued in the near future for 1990-1995 Jeep Wranglers.  The letter included a Defect Information Report ("DIF"), filed in compliance with 49 CFR Part 573.  In the DIF, under "description of defect" the defendant noted that "[t]he parking brake may self-release without warning, allowing the vehicle to roll away." (Pl.'s Mot. For Summ. J., Ex. 11.)  The DIF stated that Atwood, now owned by Dura Automotive Systems, Inc. ("Dura"), supplied the assembly that was in use from 1987 until 1995.  The report notes that "[a]ttempts to locate the complete design history of the original assembly were not successful." (*Id.*)  The complaint rate was 38.6/100,000 for the 1990-1995 Wranglers that included eighty-three accidents and four injuries.

## Standard of Review

A grant of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The moving party bears the initial burden to show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This burden is met simply by showing the Court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial.  *Id.* at 325.  The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim."  *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).  A material fact is one that may affect the outcome of the issue at trial, as determined by substantive law.  A genuine dispute exists on a material fact and, thus, summary judgment is improper, if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

The judge's function is not to weigh the evidence, but to decide whether there are genuine issues for trial.  *Anderson*, 477 U.S. at 249; *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380

6

(6th Cir. 2004).  The evidence should be construed in the light most favorable to the nonmoving party when deciding whether there is enough evidence to overcome summary judgment.  *Anderson*, 477 U.S. at 255; *Summers*, 368 F.3d at 885.

## Analysis

### A.  Plaintiff's Motion for Summary Judgment

#### 1.  Design Defect Claim

In Kentucky, "liability may be imposed on the manufacturer of a defective product under a variety of theories.  Liability may result from defective design; for manufacturing defects; and for failure to warn."  *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 250 (Ky. 1995) (internal citations omitted).  For design defect claims, Kentucky has adopted Section 402A of the Restatement (Second) of Torts, which provides,

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> 1. (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> (a) the seller has exercised all possible care in the preparation and sale of his product, and

7

> (b) the user or consumer has not bought the
> product from or entered into any contractual
> relation with the seller.

Restatement (Second) of Torts § 402A (1965). Kentucky courts have held that the difference between strict liability and negligence claims alleging design defect "is of no practical significance so far as the standard of conduct required of the defendant is concerned. In either event the standard required is reasonable care." *Jones v. Hutchinson, Manuf., Inc.*, 502 S.W.2d 66, 69-70 (Ky. Ct. App. 1973).

"[A] product is 'defective' for purposes of application of the strict liability principle when it is made according to an unreasonably dangerous design." *Id.* at 69. In order to determine whether the design is defective, "the fact finder . . . must decide whether the manufacturer that placed in commerce the product made according to an intended design acted prudently, i.e., was the design a defective condition which was unreasonably dangerous[?]" *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980); *Hill v. R.J. Reynolds* Tobacco Co., 44 F. Supp. 2d 837, 842 (W.D. Ky. 1999) (analyzing Kentucky law). The test as stated by Kentucky law is:

> The manufacturer is presumed to know the
> qualities and characteristics, and the actual
> condition, of the . . . product at the time he
> sells it, and the question is whether the
> product creates such a risk of an accident of
> the general nature of the one in question that
> an ordinary prudent company engaged in the

> manufacture of such a product would not have
> put it on the market.

*Id.* (quoting *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984)). Actual knowledge of the defect, therefore, is not required.

There are several factors to assess in determining whether a prudent manufacturer would have placed the product on the market, including, "feasibility of making the product safer, the patency of the danger of the product, the warnings and instructions given, any subsequent maintenance or repair of the product, misuse of the product and the product's inherently unsafe characteristics." *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 536 (6th Cir. 1995) (analyzing Kentucky law).

In support of Plaintiff's motion for summary judgment, the plaintiff submits the 1) recall notice; 2) the complaints made to the defendant concerning parking brake self-release for 1990-1995 Jeeps; 3) the warranty claims made to the defendant regarding parking brake assembly of 1994-1995 Jeeps; 4) the defendant's testing that concluded that the parking brake assembly repeatedly self-released; 5) ODI and VRTC testing which found the parking brake assemblies had the potential to self-release; and 6) an email from an employee of Dura that states, "if we know that the system fails by design, then we need to step-up and get the customer on the same page." Finally, the plaintiff submitted evidence that the

9

replacement brake system used by the defendant to correct the self-release problem was available at the time the instant brake assembly was designed at no additional cost.

The defendant argues that there are genuine issues of material fact as to 1) whether there was a defect in the design; 2) whether the defect caused the plaintiff's injuries; 3) whether the plaintiff caused her own injuries; and 4) whether the design was state-of-the-art at the time it was designed.[2]

As to whether the design was defective, the defendant argues that the plaintiff has not submitted any evidence that her particular parking brake assembly manifested the condition of self-release that was the subject of the recall.  The defendant submitted testimony of one of its engineers, Stephen L. Williams, that stated that he thought "[i]f you didn't have significant grease and foreign matter in the parking brake assembly, it wouldn't occur."  (Def.'s Resp., Williams Depo. at 109.)  The defendant maintains that the self-release condition was caused by a build-up of grease and foreign material over time.  (*Id.* at 255.) The defendant also asserts that the self-release condition could be due to customer operation in not engaging the brake, failure to maintain the vehicle, failure to place the car in gear, and failure

---

[2] As to this argument, the plaintiff replied that "state-of-the-art" is a defense to design defect claims, not part of the plaintiff's proof.  The Court agrees.  *See* KRS § 411.310(2) (West 2003).

to turn off the vehicle.  (*Id.*)  The defendant states that the language in the recall notice does not prove there was a defect because the company merely used statutory language mandated by federal regulations.  Further, the defendant states that the recall notice states that a defect exists in "some" Jeep Wranglers.  (Pl.'s Mot. For Summ. J., Ex. 12.)  The defendant also asserts that the email does not prove that the design was defective because the writer of the email, Adam Bienkowski ("Bienkowski"), an engineer at Dura, explains in his deposition that the email simply meant that he wanted to begin testing the design.  Bienkowski testifies that many factors, including wear and tear, miles, and the geometry of the pawl and sector, resulted in the product's problems.  (Def.'s Resp., Bienkowski Depo. at 12.)

In further support, the defendant argues that the original parking brake assembly passed federal safety standards when it was designed and, thus, that the assembly was not defective when designed.  Bienkowski testified,

> Once we had done an extraneous amount of testing and weren't able to come up with a solution, we then wanted to start looking at the design and the optimization of the design, and that's when we found negative lock-in angles and partial engagement conditions, which may have been — which may have allowed the park brake to pass testing and standards when it went into production, but as technology develops, as our experience with park brakes develop, as DaimlerChrysler's safety standards develop, what was okay yesterday wasn't necessarily okay today.

(*Id*. at 30-31.)  The defendant also argues that the complaints and warranty claims are hearsay and inadmissible because the plaintiff has not proven that they are substantially similar.  However, the Court need not address this argument, because even without excluding the evidence of complaints and warranty claims, the defendant has met its burden in showing that there are genuine issues of material fact as to whether there was a defect in the design.

As for causation, the plaintiff has the burden to establish causation, which "is defined by the substantial factor test: was the defendant's conduct a substantial factor in bringing about [the] plaintiff's harm?" *Morales*, 71 F.3d at 537.  "Plaintiff may use circumstantial evidence, and 'in that situation, the evidence must be sufficient to tilt the balance from possibility to probability.'" *King v. Ford Motor Co.*, 209 F.3d 886, 893 (6th Cir. 2000) (quoting *Huffman v. SS. Mary & Elizabeth Hosp.*, 475 S.W.2d 631, 633 (Ky. 1972)).

Apportionment is proper in products liability cases.  *See* KRS § 411.182 (LexisNexis 1996); *Caterpillar, Inc. v. Brock,* 915 S.W.2d 751, 753 (Ky. 1996) ("in all tort actions, including products liability actions, fault is to be apportioned among all parties to each claim").  Thus, although the defendant argues that the plaintiff can not prevail on her claims because the plaintiff's actions in attempting to stop the moving Jeep caused her accident,

the evidence will go to apportionment of fault, as opposed to foreclosing the plaintiff's claims.  The plaintiff's motion for summary judgment on causation, however, is denied because the defendant has shown that there are genuine issues of material fact as to whether the alleged design defect caused the plaintiff's injuries.

### 2.   Post-Sale Failure to Warn Claim

A product's warnings can be a factor in determining whether a product is defective or it can be an independent cause of action. For example, if the product's design is adequate, but the product is rendered unreasonably dangerous because the manufacturer failed to warn the ultimate user of it's foreseeable misuse, then the plaintiff has a claim for failure to warn.  *Clark*, 910 S.W.2d at 250; *Montgomery Elevator Co.*, 676 S.W.2d at 782.

The defendant argues that the plaintiff's failure to warn claim is foreclosed because Kentucky law does not recognize a cause of action for *post-sale* failure to warn.  The plaintiff, on the other hand, argues that the Kentucky Supreme Court has shown its willingness to adopt this cause of action in *Ostendorf v. Clark Equipment Co.*, 122 S.W.3d 530 (Ky. 2003).  The Court finds that Kentucky does not recognize a post-sale failure to warn claim and would not adopt such a claim if given the opportunity.

In *Ostendorf*, the plaintiff was severely injured when the

13

forklift he was driving pinned his foot to the ground. The plaintiff sued the defendant manufacturer for various products liability claims, including negligent design and strict liability, but the plaintiff did not assert a failure to warn claim. The plaintiff in *Ostendorf* also asserted a duty to retrofit claim, alleging that a manufacturer has a duty to retrofit an existing product with subsequently developed safety features. The product in question was not defective when sold, but became unsafe due of to safety developments. *Id*. at 532-33.

The Kentucky Supreme Court declined to adopt an independent duty to retrofit because "in many cases, a duty to retrofit is properly the province of an administrative or legislative body. Second, and more importantly, there is no reason to create a duty to retrofit a product not defective when sold – traditional principles of negligence and strict products liability suffice." *Id*. at 534.

The *Ostendorf* court went on to examine *Gregory v. Cincinnati Inc.*, 538 N.W.2d 325, 334 (Mich. 1995), that also declined to adopt a duty to retrofit. The *Ostendorf* court explained that *Gregory* noted that there are two retrofit scenarios:

> [A] retrofit for a latent defect or a retrofit because of a technological advance. A latent defect is one that existed undiscovered at the time of manufacture. Because a manufacturer's liability for a design defect hinges on what it knew or should have known at the time of sale, a negligence or strict liability theory

14

> can assess liability for a latent defect, so a
> duty to retrofit is unnecessary. If, however,
> the retrofit results from a post-sale
> technological advance, then the product was
> not originally defective, but has become so
> due only to the later advancement.

*Id*. at 536.

The Kentucky court went on to state that an independent duty to retrofit would place too onerous a burden on manufacturers and would turn strict liability into absolute liability. The court stated,

> A duty to retrofit is an example of a post-
> sale obligation imposed on a manufacturer.
> Other examples are the duty to warn of later-
> discovered defects or foreseeable misuses and
> the duty to recall a defective product.
> Numerous cases impose a duty to warn of later
> discovered defects. [citing cases] When a
> product is defective, a manufacturer may be
> subject to one of these post-sale duties. The
> nature of the defect will dictate the
> appropriate remedy: a defect that may result
> in a few minor injuries may only require a
> warning, whereas a defect that may result in
> serious injury or death could require more.

*Id*.

In a footnote, the court stated that "[t]he present case does not present the issue of a duty to warn. Our discussion addresses that topic only generally, as it relates to the issues in this case." *Id*. at n.1. The court's footnote makes it clear, therefore, that any discussion in *Ostendorf* concerning a post-sale duty to warn is dicta.

15

The plaintiff, however, argues that the court in *Ostendorf* showed a willingness to adopt a post-sale duty to warn by stating, "When a product is defective, a manufacturer *may* be subject to one of these post-sale duties." *Id*. (emphasis added). The entire opinion read as whole, however, indicates that Kentucky would not adopt a post-sale failure to warn cause of action. The sentence relied upon by the plaintiff is preceded by the court comparing a duty to retrofit to a post-sale duty to warn as examples of post-sale obligations imposed on manufacturers. The court states, "A duty to retrofit is an example of a post-sale obligation imposed on a manufacturer. Other examples are the duty to warn of later-discovered defects or foreseeable misuses and the duty to recall a defective product." Because the court declined to adopt the duty to retrofit, it is reasonable to assume that the court would similarly reject a post-sale duty to warn for the same reasons.

### 3.  **Warranty Claim**

The plaintiff asserts that the "Jeep did not perform as expressly and impliedly warranted by DaimlerChrysler and, as such, the Court should grant summary judgment" on the warranty claims. (Pl.'s Mot. for Summ. J. at 10.) The plaintiff submitted the deposition testimony of the defendant's employee, Jennifer Hagen ("Hagen"), who stated that the defendant knew that customers expected their parking brake to hold the vehicle. In response, the defendant argues that the plaintiff can not prevail on summary

16

judgment because the four year statute of limitations is expired due to the car's eleven year age. Further, the defendant argues that the plaintiff failed to introduce evidence that there were any warranties and that the defendant breached said warranties. (Def.'s Resp. at 12.)

In reply, the plaintiff does not submit any evidence of express warranties, nor argue that any are present. The plaintiff limits her argument to implied warranties of merchantability and fitness. Plaintiff asserts that implied warranties are present unless disclaimed and there is no proof that the warranties were modified, and further that the defendant did not offer "any proof that it did not breach those warranties." (Pl.'s Reply at 13.)

The Court agrees with the defendant that there are genuine issues of material fact as to the warranty claims. Not only is there conflicting evidence as to whether the product was defective, there is also conflicting evidence as to whether the defendant breached any implied warranties. Further, in order to prove a breach of implied warranty claim, the plaintiff has to prove privity with the manufacturer, which has not been shown. *Williams v. Fulmer*, 695 S.W.2d 411, 412-13 (Ky. 1985). Accordingly, summary judgment in the plaintiff's favor must be denied on this claim.

**B.    Defendant's Motion for Dismissal of Punitive Damages**

In order to state a claim for punitive damages pursuant to

Kentucky law, the plaintiff must allege that the defendant "acted toward the plaintiff with oppression, fraud or malice." KRS § 411.184(2) (West 2003).[3] In Kentucky, gross negligence, or a wanton or reckless disregard for the lives, safety, or property of others is sufficient conduct to warrant punitive damages. *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 52 (Ky. 2003).

The plaintiff asserts that the defendant's conduct in designing the brake assembly and conduct after the sale of the Jeep supports an award of punitive damages. The defendant argues that the plaintiff's punitive damages claim should be dismissed because the plaintiff does not have sufficient evidence to support the claim and, further, that awarding punitive damages would violate the defendant's due process rights.

### 1.    Pre-Sale Conduct in Designing Brake Assembly

The plaintiff argues that the defendant's pre-sale conduct in designing the brake assembly amounts to gross negligence because the defendant "not only knew that the parking brake assembly at

---

[3] This law is still valid although the Kentucky Supreme Court in *Williams v. Wilson*, 972 S.W.2d 260 (Ky. 1998), declared section 411.184(c) unconstitutional that required subjective awareness in order to prove malice. *Id.* at 268-69. *Williams* held that requiring the plaintiff to prove subjective intent violated the Kentucky Constitution because it elevated the proof beyond what was required at common law, gross negligence. *Id.* at 264. Thus, malice may be implied and subjective intent is not required. The court expressly stated that section 411.184(2) was not at issue. *Id.* at 270. The defendant assumes for the purposes of the summary judgment motion that the post-*Williams* standard applies for the defendant's conduct that pre-dated *Williams*.

issue could self-release but knew that it was an extremely dangerous condition." (Pl.'s Resp. at 4.) The plaintiff premises the defendant's knowledge on 1) the absence of a Failure Mode and Effects Analysis ("FMEA") report for the original brake assembly; and, alternatively, 2) speculation as to what must have been in the FMEA report for the original brake assembly if the report was completed by what is documented in the FMEA report for the replacement brake assembly.

An FMEA report, prepared by engineers, analyzes potential failure modes and ranks them in severity, occurrence, and detection. Hagen, an employee of the defendant, studied the recall file and when asked at what time FMEAs are prepared, testified that reports are supposed to be conducted in the early phase of the design. (Hagen Depo. at 330.) Plaintiff takes this statement to mean that the report should have been completed for the original system. In the same deposition, Hagan also testified that something like a FEMA was probably completed on the original brake system, but that when the original system was designed, the reports were not documented in writing as they are today. (*Id*. at 326-27.)

The plaintiff uses the FMEA report for the *replacement* brake assembly system to prove what must have been included in the FMEA report for the *original* brake assembly. The FMEA report for the replacement brake assembly denotes a ten out of ten, which is the highest severity rating possible and an occurrence rating of one to

three. Plaintiff states that the FMEA report for the original brake assembly must have been greater in severity and occurrence since the replacement brake system was created to correct problems in the original system. Thus, plaintiff asserts that the defendant was on notice that original brake assembly system was defective and dangerous.

The defendant asserts that the plaintiff's evidence can not withstand summary judgment on punitive damages for pre-sale conduct. The Court agrees. Viewing the evidence in the light most favorable to the plaintiff, she has not presented sufficient evidence beyond mere speculation. Even assuming the FMEA report for the original brake system was completed, the FMEA report for the replacement brake system, completed after the design of the original system, does not in any way prove the content of the FMEA report for the original brake system.

Further, the plaintiff has not shown the Court how failure to complete the FMEA report amounts to gross negligence. It is undisputed that the defendant's design complied with Federal safety standards. Although not dispositive of the issue of punitive damages, this undisputed fact weighs against punitive damages for pre-sale design defect, especially because there is no other evidence that the defendant was grossly negligent in designing the original brake system. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 893 (2000) (noting that if the defendants "were ultimately

20

found liable, such compliance would presumably weigh against an award of punitive damages").

Finally, the plaintiff's evidence showing that there were alternative designs that were safer and more cost effective does not rise to the level of gross negligence. Proving there was an alternative design that was feasible and cost effective, while part of the plaintiff's proof for a defective design claim, *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004), is not sufficient to prove punitive damages. Because the plaintiff has presented no evidence other than mere speculation that "something about the defendant's conduct was outrageous, was at least grossly negligent, and amounted to reckless indifference[,]" *Suffix U.S.A., Inc. v. Cook*, 128 S.W.3d 838, 841 (Ky. Ct. App. 2004), the plaintiff's punitive damages claim based on pre-sale conduct must be dismissed.

### 2.   Post-Sale Conduct

The Court has already held that Kentucky does not recognize a post-sale failure to warn. Therefore, the plaintiff's evidence of the defendant's post-sale conduct has to be relevant to the design defect claim in order to warrant an award of punitive damages. The Court finds that although the defendant's reaction to discovering the alleged defect and subsequent investigation may prove there was a latent defect in the product when sold, the defendant's conduct after the sale does not create genuine issues of fact as to whether

the defendant was grossly negligent in designing the product.

The plaintiff's case cited in support of awarding punitive dames, *Suffix*, 128 S.W.3d at 838, is distinguished because in that case, the recall occurred after the plaintiff's injuries, there was no evidence of compliance with regulations and no evidence that the defendant manufacturer tested the product before its entrance into the market. *Id.* at 840-43; *see also Jimenez v. DaimlerChrysler*, 269 F.3d 439, 452 (4th Cir. 2001) (holding that evidence of customer complaints and manufacturer conduct that occurred post-sale, after a defect was discovered did not show clear and convincing evidence of "a consciousness of wrongdoing at the time of the tortious conduct at issue" sufficient to warrant punitive damages in a design defect cause of action). The post-sale conduct of the defendant, thus, does not support an award of punitive damages.

### Conclusion

Accordingly, and for the foregoing reasons, **IT IS ORDERED:**

(1) That the defendant's motion for summary judgment on punitive damages [Record No. 66] be, and the same hereby is, **GRANTED.**

(2) That the plaintiff's punitive damages claims be, and the same hereby are, **DISMISSED WITH PREJUDICE.**

(3) That the plaintiff's motion for summary judgment [Record No. 68] be, and the same hereby is, **DENIED**.

This the 20th day of October, 2005.



Signed By:

**_Joseph M. Hood_**

**United States District Judge**